Glenna LLOYD, Plaintiff,

v.

William A. HALTER, Acting Commissioner of Social Security,[1] Defendant.

No. 99–4038–DES.

United States District Court, D. Kansas.

March 19, 2001.

---

1. William A. Halter is acting Commissioner of Social Security. In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, William A. Halter should be substituted for Kenneth S. Apfel as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of 42 U.S.C. § 405(g).

### *MEMORANDUM AND ORDER*

SAFFELS, District Judge.

This matter is before the court on plaintiff's request seeking reversal of the Social Security Commissioner's denial of disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.* The court has reviewed the administrative record and the briefs of both parties. For the following reasons, the plaintiff's request is granted. This case is reversed and remanded for a determination consistent with this opinion.

## I. PROCEDURAL BACKGROUND

On June 4, 1997, plaintiff filed an application for disability benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.* Plaintiff alleged the date of disability onset was May 1, 1997. Her application was denied initially and again on reconsideration. Plaintiff then requested an administrative hearing. On April 28, 1998,

the administrative law judge ("ALJ") rendered a decision in which he found that plaintiff was not under a "disability" as defined in the Social Security Act. On February 25, 1999, plaintiff's request for review of that decision by the Appeals Council was denied. The ALJ's decision stands as the final decision of the Commissioner.

## II. FACTUAL BACKGROUND

Plaintiff was born May 22, 1955, and was forty-two years old at the time of her administrative hearing. She is five foot, five inches tall and weighs 190 pounds. Plaintiff is a high school graduate and attended one semester at a junior college. She has no vocational or technical training. Plaintiff's last job was as an emergency dispatch worker, which required her to answer emergency phone lines and obtain information on the computer. The job ended in December 1996. Prior to her job as an emergency dispatch worker, plaintiff worked as a legal secretary but quit because she could no longer type or file due to carpal tunnel syndrome. She also has prior experience as a secretary/bail bondsman. Plaintiff alleges an inability to work, beginning May 1, 1997, due to bilateral carpal tunnel syndrome, non-insulin dependant diabetes and panic attacks.

Plaintiff has a long medical history, which is summarized below. Plaintiff has been diagnosed as suffering from diabetes, carpal tunnel syndrome, tendinitis, lumbosacral stain, coccydynia, back strain, depression, dysthemia and generalized anxiety disorder with panic features. Plaintiff began reporting wrist pain and numbness in her hand and forearm to a physician in 1981, until the symptoms became intolerable in 1989. In August 1989, plaintiff had surgery, a bilateral carpal tunnel release, to relieve the pain, but the problems persisted. She also began reporting persistent problems with her back and spine in 1989.

In 1990, Dr. Ernest Schlachter placed permanent limitations on plaintiff, including no repetitive pushing, pulling, twisting, or grasping motions with either arm or hand, no working above the horizontal with either arm or hand, no lifting over ten pounds with either arm or hand, and avoiding cold environments and vibratory tools. Upon examining the medical record and Dr. Schlachter's evaluation, Jerry Hardin, Human Resource Consultant, opined that plaintiff was disabled in view of the fact that many of the jobs in the open labor market which plaintiff was qualified for, based on her education, training and experience, required motions and actions which would violate her medical restrictions.

In 1991 and 1993, plaintiff continued to report back pain. In 1994, plaintiff began suffering from shortness of breath. In January 1997, test results revealed plaintiff had a high glucose level. On February 4, 1997, plaintiff's GHB level was at fourteen percent with a normal range of eight to four percent, and plaintiff was given medication. By February 20, 1997, plaintiff reported that she felt much better since her non-insulin diabetes was under control. Medical reports dated February 26, 1997, indicate plaintiff's diabetes was controlled.

On February 26, 1997, plaintiff complained to Dr. Clarence Clayton of a tingling sensation in her toes and feet that was present most of the time and pain that occurred in the morning when she first put pressure on her feet. An examination of plaintiff revealed some diminished sensation to pinprick on the toes. Dr. Clayton advised plaintiff to wear a more supportive shoe. He also concluded that plaintiff's foot problems were probably caused by her diabetes, using the phrase "diabetic foot care."

On April 4, 1997, plaintiff sought treatment for her complaints of increased depression and anxiety. Examination revealed plaintiff was mildly anxious and depressed and was tearful at times. Plaintiff was diagnosed with anxiety and depression unspecified and was given a prescription for Serzone. On May 9, 1997, plaintiff reported crying spells and memory loss. Progress notes on June 19, 1997, revealed that plaintiff had pain in her hand and had suffered a panic attack in the last week.

On June 24, 1997, plaintiff saw Dr. Ronald Reschly for treatment of carpal tunnel syndrome. Testing did not reveal any abnormalities. Dr. Reschly informed plaintiff her symptoms were probably related to her diabetic condition, which was controlled. In July 1997, tests revealed plaintiff's blood sugar levels were "very good" and her GHB had dropped from fourteen percent to 6.7 percent, which is within a normal non-diabetic level. A July 3, 1997, progress note reports that plaintiff had a panic attack the previous week. The examiner's impression was anxiety and depression, and he increased plaintiff's Serzone prescription.

On October 1, 1997, Dr. Mark Goodman, Ph.D. saw plaintiff for a mental status evaluation. Plaintiff's chief complaint was that she worried about a lot of things and that little things upset her. Plaintiff described herself as a "basket case." Plaintiff reported loss of strength in both hands and feet and problems with her wrists due to carpel tunnel syndrome. Plaintiff also reported panic attacks. The attacks occurred daily and lasted thirty minutes to an hour. Plaintiff said she "feels like the world is crashing down on me." Plaintiff reported difficulty breathing and depression. She also reported difficulty with sleeping, concentrating, and memory. Dr. Goodman opined that plaintiff could follow simple oral instructions, carry out instructions under ordinary supervision, relate appropriately to co-workers and supervisors, and otherwise appropriately handle simple, routine, and low-stress work.

On October 20, 1997, Dr. George Stern completed a Mental Functional Capacity Assessment. He found that plaintiff had moderately limited ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. He also found that plaintiff could perform work at a consistent pace without an unreasonable number or length of rest periods. Dr. Stern opined that plaintiff does have episodic panic attacks, which may, on occasion, result in work interruptions. Dr. Stern also completed a Psychiatric Review Technique form at the request of the Social Security Administration. Dr. Stern noted that plaintiff had dysthymic symptoms and episodic panic attacks. He opined that plaintiff had slight restriction of daily living activities, slight difficulty maintaining social functioning, and often had limitations in deficiencies of concentration, persistence, and pace.

On January 19, 1998, plaintiff saw Dr. Grace Ang for a follow-up of her diabetes. Dr. Ang noted that plaintiff's blood sugar was normal, regularly in the low 100's. Plaintiff complained of shortness of breath, worsening panic attacks, memory problems, and inability to concentrate on more than one thing at a time.

On February 3, 1998, plaintiff saw Dr. Dan Montgomery with a chief complaint of nerves. Dr. Montgomery noted that plaintiff had difficulty with memory, concentration, and sleeping and that plaintiff feels tearful. Dr. Montgomery diagnosed plaintiff as having major depression and panic disorder and altered her medication. On February 19, 1998, Dr. Montgomery noted that plaintiff was not sleeping at night and again altered her medication. On March, 27, 1998, plaintiff reported to Dr. Mont-

gomery an increase in anxiety and depression. Dr. Montgomery noted that plaintiff seemed quite anxious and depressed. Dr. Montgomery contributed the increased anxiety and depression to complications with the medications. Dr. Montgomery again saw plaintiff on April 16, 1998, for the same symptoms.[2]

At the administrative hearing on April 21, 1998, plaintiff testified that she became diagnosed with diabetes in February 1997. Her condition is controlled by oral medication and diet. Plaintiff becomes sleepy due to low blood sugar. Plaintiff testified that her diabetes increases her pain symptoms. As a result of carpal tunnel syndrome, plaintiff has pain in her wrists/hands which radiates up her arms. She testified that she had problems straightening her fingers and had very little grip strength. Plaintiff cannot push or pull. She could not lift more than five to ten pounds. Plaintiff has back pain. Plaintiff testified that she could not sit in one position for more than a few minutes and sit for a total of three hours in an eight-hour workday. Sitting is difficult because of circulation changes in her diabetes. She can only stand for fifteen minutes without experiencing pain and stand a total of two hours out of an eight-hour workday. Plaintiff can walk for about one block before experiencing problems. Plaintiff also described side-affects of her medications, including becoming dizzy, jittery, nauseous, depressed, and anxious.

As to her mental problems, plaintiff testified that she is depressed, which has been diagnosed as major. Plaintiff testified that she began having panic attacks a few years ago, but did not realize what they were until April 1997. The attacks have worsened recently. Plaintiff said she averages two to three panic attacks a week. The panic attacks last fifteen to thirty minutes and occur during the day, although not at a set time during the day. Plaintiff said she quit working in June 1997, because the panic attacks made her a danger to her coworkers. Plaintiff said the panic attacks could result in work interruptions. Plaintiff also described crying twice a day, which usually occurred at night. The crying spell can go on for hours.

As to her daily activities and abilities, plaintiff testified that her activity is impeded by diabetes. She sleeps for one to four hours every day. Plaintiff described a normal morning as getting her family up for work and school, fixing breakfast, bathing, getting dressed, and morning snack. During the day, she visits with her friend or goes grocery shopping if she feels up to it. Plaintiff does some cooking and housework, but her husband and daughter do most of the chores. Plaintiff can care for herself, but it takes longer amounts of time. She has difficulty with yard work, laundry, dishes, vacuuming, and other household chores. She has no hobbies.

Plaintiff's friend, Rena Smith, testified in support of plaintiff. Smith said she had known plaintiff for ten years and sees her on a daily basis. She has observed plaintiff's panic attacks and described the attacks as lasting thirty minutes to an hour. During the attacks, plaintiff becomes confused, breathes rapidly, cries, and can not function. Smith said plaintiff has these attacks on a daily basis. Smith described plaintiff as a depressed person who cries a lot. Smith confirmed that plaintiff's husband and daughter do most of the housework.

Cindy Younger, vocational expert, testified in response to hypothetical questions. The ALJ asked Younger to assume an individu-

---

**2.** Plaintiff presents additional documentation of her medical history after the administrative hearing, which is attached to plaintiff's initial complaint. The court has reviewed these documents but not included a summary of the documents in this memorandum and order.

al of plaintiff's age, education and work experience who could occasionally lift a maximum of twenty pounds, frequently lift ten pounds, stand and walk for fifteen minutes at a time for a total of two hours per day, and sit for one hour at a time, with the opportunity for position changes and standing, for a total of six hours per day. The individual was incapable of work activity involving repetitive fingering and overhead reaching. The individual also had a psychological condition which caused moderate limitations in her ability to understand and remember, to carry out detailed instructions, and to accept instruction and criticism from a supervisor. Younger testified that such individual's sedentary job base was reduced by ninety-eight percent. The remaining two percent job base included the jobs of coop operator, of which there were 400 jobs in Kansas and 40,000 nationwide, and security monitor, of which there were 1,100 jobs in Kansas and 125,000 nationwide. Plaintiff's attorney then asked if panic attacks not occurring at regular break times would affect the individual's employment, and Younger responded that it would.

## III. STANDARD OF REVIEW

Title 42, § 405(g) of the United States Code provides for judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA"). The reviewing court must determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Washington v. Shalala,* 37 F.3d 1437, 1439 (10th Cir.1994). Substantial evidence is adequate, relevant evidence that a reasonable mind might accept to support a conclusion. *Hargis v. Sullivan,* 945 F.2d 1482, 1486 (10th Cir.1991). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence ." *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir.1994) (citation omitted). "A finding of no sub-

stantial evidence will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence." *Trimiar v. Sullivan,* 966 F.2d 1326, 1329 (10th Cir.1992) (citations omitted). The reviewing court must also determine whether the Commissioner applied the correct legal standards. *Washington,* 37 F.3d at 1439. Reversal is appropriate not only for lack of substantial evidence, but also for cases where the Commissioner uses the wrong legal standards. *Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir.1994). In applying these standards, the court must keep in mind the purpose of the Social Security Act is to ameliorate some of the rigors of life for those who are disabled. *Dvorak v. Celebrezze,* 345 F.2d 894, 897 (10th Cir.1965).

## IV. COMMISSIONER'S DECISION

In the April 28, 1998, decision, the ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Act on May 1, 1997, the date the claimant stated she became unable to work, and has acquired sufficient quarters of the coverage to remain insured through at least December 31, 1999.

2. The claimant has not engaged in substantial gainful activity since no later than May 1, 1997.

3. The medical evidence establishes that the claimant has status post carpal tunnel release, depression and an anxiety disorder due to panic attacks, impairments which are severe but which do not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's statements concerning her impairments and their impact on her ability to work are credible only to the extent they indicate an inability to engage

in activity exceeding the residual functional capacity set forth below.

5. The claimant retains the residual functional capacity to perform the exertional demands of sedentary work in that she is able to occasionally lift or carry up to 20 pounds and up to 10 pounds frequently; to stand and walk 15 minutes at a time for a total of 2 hours in an 8 hour workday; and to sit for 1 hour at a time with position changes for a total of 6 hours in an 8 hour workday.

6. The claimant is unable to perform her past relevant work as a secretary, legal secretary, emergency dispatcher or groundskeeper.

7. The claimant's capacity for the full range of sedentary work is diminished in that she is incapable of work activity involving repetitive fingering and restricted from overhead reaching. The claimant's psychological condition presents moderate (not frequent) limitations in her ability to understand and remember as well as carry out detailed instructions and her ability to accept instructions and criticism from a supervisor appropriately.

8. The claimant is 42 years old, a "younger individual."

9. The claimant has a high school education.

10. The claimant has skilled and semi-skilled work experience but has acquired no transferable work skills.

11. Based on an exertional capacity for sedentary work, and the claimant's age, education background, and work experience, Section 404.1569 and rule 201.28, Table 1, Appendix 2, Subpart P, Regulations No. 4, would direct a conclusion of "not disabled."

12. Although the claimant is unable to perform the full range of sedentary work, she is capable of making an adjustment to work which exists in significant numbers in the national economy. Such work includes employment as a call out operator or security monitor. A finding of "not disabled" is therefore reached within the framework of the above-cited rule.

13. The claimant has not been under a disability, as defined in the Social Security Act, at any time through the date of this decision.

## V. DISCUSSION

To qualify for disability insurance benefits, a claimant must establish that she meets the insured status requirements, is under sixty-five years of age, and is under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir.1991). As defined in the Act, "disability" is the inability to engage in any substantial gainful activity for at least twelve months due to a medically determinable impairment. 42 U.S.C. § 423(d)(1)(A) (1995). The Commissioner has established a five-step evaluation process for determining whether a claimant is disabled within the meaning of the Act. *Reyes v. Bowen*, 845 F.2d 242, 243 (10th Cir.1988). Those five steps are as follows:

(1) A person who is working is not disabled.

(2) A person who does not have an impairment or combination of impairments severe enough to limit the ability to do basic work activities is not disabled.

(3) A person whose impairment meets or equals one of the impairments listed in the regulations is conclusively presumed to be disabled.

(4) A person who is able to perform work [he] has done in the past is not disabled.

(5) A person whose impairment precludes performance of past work is disabled unless the [Commissioner] demonstrates that the person can perform other work. Factors to be considered are age, education, past work experience, and residual functional capacity.

20 C.F.R. § 416.920. The claimant has the burden of establishing disability at the first four steps. *Ray v. Bowen,* 865 F.2d 222, 224 (10th Cir.1989). At step five, the burden shifts to the Commissioner to establish the claimant retains the ability to perform other work which exists in the national economy. *Id.* Although the ALJ determined that plaintiff could not perform her past relevant work, he found that she had the retained functional capacity to perform available sedentary work.

Plaintiff argues the ALJ's decision is not supported by substantial evidence because the ALJ (1) erred in evaluating her allegations of pain, (2) failed to make proper credibility determinations, (3) failed to develop plaintiff's physical residual functional capacity and mental functional limitations, (4) used an incorrect hypothetical and the two percent sedentary job base is not significant; and (5) did not consider new and material evidence submitted to the appeals council after the administrative hearing.

The court first notes that this is a close case that turns on the ALJ's credibility findings. Based on the ALJ's determination of plaintiff's residual functional capacity, plaintiff is limited to two percent of the sedentary job base. Plaintiff submitted additional evidence to the Appeals Council after the ALJ's decision, which reveals plaintiff suffers from fibromyalgia. Fibromyalgia has been described as:

[A] common, but elusive and mysterious disease, much like chronic fatigue syndrome, with which it shares a number of features.... Its cause or causes are unknown, there is no cure, and of greatest importance to disability law, its symptoms are entirely subjective.... The principal symptoms are pain all over, fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character— multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

*Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir.1996). Upon examination, Dr. Frederick Wolfe determined plaintiff had all eighteen tender spots. Fibromyalgia does not require a traumatic onset, and it is highly likely that the pain complained of by plaintiff was the result of fibromyalgia.

Evidence obtained after an ALJ's decision must be material in order to be considered. 42 U.S.C. § 405(g). Information is material only if it is non-cumulative and relevant to the claimant's condition on or before the date of the ALJ's decision. *Woolf v. Shalala,* 3 F.3d 1210, 1215 (8th Cir.1993). "For remand to be appropriate when good cause is shown, it must be determined 'that the new evidence would have changed the Commissioner's decision had it been before him." *Heimerman v. Chater,* 939 F.Supp. 832, 833 (D.Kan.1996) (citing *Hargis v. Sullivan,* 945 F.2d 1482, 1493 (10th Cir.1991)). Plaintiff argues that the information submitted is material because it includes a diagnosis of fibromyalgia. The government argues the fibromyalgia diagnosis did not reveal a "new" disease but was merely a way of explaining plaintiff's existing symptoms, which have already been considered and rejected as a basis for disability by the ALJ.

The court finds the new evidence is material and non-cumulative. It is clear that courts have recognized that the pain suffered by those diagnosed with fibromyalgia can be disabling. *See Sarchet,* 78 F.3d at 309; *Cline v. Sullivan,* 939 F.2d 560 (8th Cir.1991); *Ward v. Apfel,* 65 F.Supp.2d 1208 (D.Kan.1999); *Biri v. Apfel,* 4 F.Supp.2d 1276 (D.Kan.1998). The outcome of this case turns on whether the ALJ finds the plaintiff's testimony credi-

ble. The fact that plaintiff has been diagnosed with fibromyalgia, which can cause the disabling pain described by plaintiff, would likely change the ALJ's credibility determination as to plaintiff's subjective complaints, such as her ability to stand and sit due to back and shoulder pain. Therefore, the court finds this case is appropriate to reverse and remand. On remand, the Commissioner is to determine plaintiff's credibility in light of the diagnosis of fibromyalgia.

**IT IS THEREFORE BY THE COURT ORDERED** that plaintiff's request seeking reversal of the Social Security Commissioner's denial of disability insurance benefits is granted. This case is reversed and remanded to the Social Security Commissioner for additional proceedings consistent with this opinion.